JULIAN HAMMOND (SBN 268489)
jhammond@hammondlawpc.com
ADRIAN BARNES (SBN 253131)
abarnes@hammondlawpc.com
ARI CHERNIAK (SBN 290071)
acherniak@hammondlawpc.com
POLINA BRANDLER (SBN 269086)
pbrandler@hammondlawpc.com
HAMMONDLAW, P.C.
1201 Pacific Ave, 6th Floor
Tacoma, WA 98402
(310) 807-1666 (Office)
(310) 295-2385 (Fax)

*Attorneys for Plaintiff and the Putative Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JOSH BLAKELEY** on behalf of himself and all others similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>The **NATIONAL RUGBY LEAGUE LIMITED**, an Australian Private Company, **FOX SPORTS AUSTRALIA PTY LIMITED**, an Australian Private Company, and **FOX SPORTS STREAMCO PTY LIMITED**, an Australian Private Company,<br><br>    Defendants. | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

1   Plaintiff Josh Blakeley, on behalf of himself and all others similarly situated, alleges the

2   following based upon personal knowledge, or, where applicable, information, belief, and the

3   investigation of counsel:

4   **NATURE OF THE ACTION**

5   1.   This is a class action suit brought on behalf of all persons with Meta Platforms, Inc.

6   (formerly known as Facebook) ("Meta" or "Facebook") accounts who subscribe or have subscribed

7   during the relevant period to Watch NRL and viewed videos on www.watchnrl.com.

8   2.   Watch NRL is a partnership, operated jointly by Defendants, which offers a video-

9   streaming service providing access to live streams and on-demand prerecorded videos of Australian

10  Rugby League games, highlights, and related shows through the Watch NRL website –

11  www.watchnrl.com – and various dedicated apps.

12  3.   Watch NRL makes money by offering paid subscriptions in exchange for access to its

13  live streams and library of prerecorded videos.

14  4.   Plaintiff and other Class Members must subscribe to Watch NRL to watch prerecorded

15  videos at www.watchnrl.com. A basic subscription costs AUD $24 per week, AUD $44 per month, or

16  AUD $229 per year.[1] See Figure #1 below:



28  ─────────────
[1] *See* https://www.watchnrl.com (Last visited August 5, 2024)

5.      Plaintiff brings this action in response to Watch NRL's practice of knowingly disclosing its subscribers' personally identifiable information – including a record of every video clip they view– ("Personally Identifiable Information" or "PII") to Meta and/or other unrelated entities.

6.      The United States Congress passed the Video Privacy Protection Act ("VPPA") in 1988, seeking to confer onto consumers the power to "maintain control over personal information divulged and generated in exchange for receiving services from video tape providers." S. Rep. No. 100-599, at 8 (1988). "The Act reflects the central principle of the Privacy Act of 1974: that information collected for one purpose may not be used for a different purpose without the individual's consent." *Id.*

7.      Watch NRL violates the VPPA by knowingly transmitting Plaintiff's and other Class Members' Personally Identifiable Information to Meta and/or other unrelated third parties, without Watch NRL's subscribers' consent.

**PARTIES**

8.      Plaintiff Blakeley is, and has been at all relevant times, a resident of El Cajon, California. In or about July 2023, Blakeley signed up for a service that Watch NRL describes as a "12-Month Subscription,"[2] by agreeing to pay an amount in exchange for a year's access to Watch NRL's live streams and library of prerecorded videos. Since he first subscribed to Watch NRL's services, Blakeley has viewed dozens of pre-recorded videos on Watch NRL's website – www.watchnrl.com – using his personal computer. Throughout the time that Blakeley has subscribed to Watch NRL's services, he has also had a Facebook account and has used that account on his personal computer.

9.      Defendant the National Rugby League Limited (the "NRL") is an Australian Private Company headquartered in New South Wales, Australia.

10.     Defendant Fox Sports Australia Pty Limited ("Fox Sports") is an Australian Private Company headquartered in Artarmon, New South Wales, Australia.

11.     Defendant Fox Sports StreamCo Pty Limited ("StreamCo") is an Australian Private Company headquartered in Artarmon, New South Wales, Australia. StreamCo is a wholly-owned subsidiary of Fox Sports.

---

[2] *Id.*

12.     Defendants operate a partnership, doing business as Watch NRL, which is a video-streaming service offering access to live streams and on-demand prerecorded videos of Australian Rugby League games, highlights, and related shows through the Watch NRL website – www.watchnrl.com – and various dedicated apps.

13.     Through their partnership, Watch NRL, each Defendant was and is directly involved in and jointly responsible for Watch NRL's conduct as described in this Complaint. Moreover, at all relevant times, each Defendant knew or realized, or should have known or realized, that the other Defendants were engaged in or planned to engage in the violations of law alleged in this Complaint. Knowing or realizing that the other Defendants were engaging in such unlawful conduct, each Defendant nevertheless facilitated the commission of those unlawful acts. Each Defendant intended to and did encourage, facilitate, or assist in the commission of the unlawful acts, and thereby aided and abetted the other Defendants in the unlawful conduct.

## JURISDICTION

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, because this suit is brought under the laws of the United States, *i.e.*, the Video Privacy Protection Act, 18 U.S.C. §§ 2710 *et seq.*

15.     This Court has specific jurisdiction over Defendants because Defendants have purposefully and differentially directed and targeted the U.S. market, by and through the following actions described in subparagraphs (a)-(e):

(a)     Out of Watch NRL's five server facilities, four are located within the United States, which on information and belief, provides Watch NRL's U.S. customers with reduced latency and improved website performance as compared to Watch NRL's non-U.S. based customers.[3]

(b)     Data from August 2024 shows that the majority of Watch NRL's traffic comes from the United States.[4]

(c)     The majority of Watch NRL's Point of Presence ("POP") servers are located

---

[3] See https://dnsmap.io/#/A/www.watchnrl.com
[4] See August 2024 Similiarweb.com's Watchnrl.com's website analysis.

within the U.S., which on information and belief, provides Watch NRL's U.S. customers with reduced latency and improved website performance as compared to Watch NRL's non-U.S. based customers.[5]

(d)    Watch NRL is an <u>international</u> service – "This service is not available from Australia, New Zealand and the Pacific Islands,"[6] and, on information and belief, Watch NRL engages in significant, long-term business activity purposefully directed toward the United States, by, *inter alia*, the maintenance of its interactive websites directed at and accessible to residents of the United States.

(e)    Defendant's activities in the Unites States are continuous and systematic, and Defendant directs substantial business activity into this forum.

16.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving raise to the claims asserted in this action occurred in the judicial district where this action is brought.

## FACTUAL BACKGROUND

### I.    The VPPA

17.    The origins of the VPPA begin with President Reagan's nomination of Judge Robert Bork to the United States Supreme Court. During the confirmation process, a movie rental store disclosed the nominee's rental history. Congress responded by passing the VPPA, with an eye on the digital future. As Senator Patrick Leahy, who introduced the Act, explained:

> It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home. [I]n an era of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone. I think this is wrong.

S. Rep. No. 100-599, at 5-6 (1988) (internal ellipses and brackets omitted).

18.    The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any

---

[5] https://www.cloudflare.com/network/
[6] https://www.watchnrl.com

person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710 (b)(1). The VPPA defines "personally identifiable information" as including "information which identifies a person as having requested or obtained specific video materials or services from a video service provider." 18 U.S.C. § 2710(a)(3). A video tape provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

## II.    The Meta Tracking Pixel

19.    Meta, which operates Facebook and was called Facebook, Inc. until changing its name to Meta in January 2022, is the world's largest social media company. Meta reported having 2.04 billion daily active users as of March 2023,[7] and reported $116.61 billion in revenue in fiscal year 2022.[8]

20.    Meta's current revenue, as well as its revenue when the company was called Facebook, Inc., has been derived almost entirely from selling targeted advertising to Facebook users, users of its family of apps including Instagram, and internet users on non-Facebook sites that integrate Meta marketing source code on their websites. Meta reported in Fiscal Year 2022 that its revenue from advertising was over $113 billion and Meta stated that it "generated substantially all of our revenue from selling advertising placements on our family of apps to marketers."[9] In its 10k filing covering the fiscal year 2018, Facebook similarly admitted that, "We generate substantially all of our revenue from selling advertising placements to marketers."[10]

21.    Facebook describes itself as a "real identity platform,"[11] meaning users are allowed only

---

[7] Meta Reports First Quarter 2023 Results, https://s21.q4cdn.com/399680738/files/doc_news/Meta-Reports-First-Quarter-2023-Results-2023.pdf

[8] Meta Reports Fourth Quarter and Full Year 2022 Results, 2/1/23, https://s21.q4cdn.com/399680738/files/doc_financials/2022/q4/Meta-12.31.2022-Exhibit-99.1-FINAL.pdf (last visited 6/6/2023).

[9] Meta, SEC 10k filing for the Fiscal Year Ending Dec. 31, 2022, https://www.sec.gov/Archives/edgar/data/1326801/000132680123000013/meta-20221231.htm (last visited June 19, 2022).

[10] Facebook, SEC 10k filing for the Fiscal Year Ending Dec. 31, 2018. https://www.sec.gov/Archives/edgar/data/1326801/000132680119000009/fb-12312018x10k.htm

[11] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).

one account and must share "the name they go by in everyday life."[12]  Therefore, when users create an account, they must provide their first and last name, along with their birthday and gender.[13]

22.     Facebook sells advertising space by highlighting its ability to target users.[14] Facebook can target users so effectively because it surveils user activity both on and off its site.[15] This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "Connections".[16] Facebook complies this information into a generalized dataset called "Core Audiences", which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[17]

23.     Advertisers can also build "Custom Audiences".[18] Custom Audiences enable advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have visited [their] website."[19] Advertisers can use a Custom Audience to target existing customers directly, or they can use it to build a "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[20] Unlike Core Audiences, Custom Audiences require an advertiser to supply the underlying data to Facebook. They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools," which collect and transmit the

---

[12] Facebook, Community Standards, Part IV Integrity And Authenticity, https://www.facebook.com/communitystandards/integrity_authenticity.
[13] Facebook, Sign-Up, http://www.facebook.com/
[14] Facebook, Why Advertise On Facebook, https://www.facebook.com/business/help/205029060038706.
[15] Facebook, About Facebook Pixel, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.
[16] Facebook, Ad Targeting: Help Your Ads Find The People Who Will Love Your Business, https://www.facebook.com/business/ads/ad-targeting.
[17] Facebook, Easier, More Effective Ways To Reach The Right People On Facebook, https://www.facebook.com/business/news/Core-Audiences.
[18] Facebook, About Custom Audiences, https://www.facebook.com/business/help/744354708981227?id=2469097953376494.
[19] Facebook, About Events Custom Audience, https://www.facebook.com/business/help/366151833804507?id=300360584271273.
[20] Facebook, About Lookalike Audiences, https://www.facebook.com/business/help/164749007013531?id=401668390442328.

data automatically.[21] One such Business Tool is the Meta Tracking Pixel.

24. The Meta Tracking Pixel is a piece of code that advertisers, like Defendant, can integrate into their website. Once activated, the Meta Tracking Pixel "tracks the people and type of actions they take."[22] When the Meta Pixel captures an action, it sends a record to Facebook. Once this record is received, Facebook processes it, analyzes it, and assimilates it into datasets like the Core Audiences and Custom Audiences.

25. Advertisers control what actions—or, as Facebook calls it, "events"—the Meta Tracking Pixel will collect along with what pages a visitor views and what buttons a visitor clicks.[23] Advertisers can also configure the Meta Tracking Pixel to track other events. Meta offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[24] An advertiser can also create their own tracking parameters by building a "custom event."[25]

26. Advertisers control how the Meta Tracking Pixel identifies visitors. The Meta Tracking Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific Data."[26] Http Headers collect "IP Addresses, information about web browser, page location, document, [referrer] and persons using the website."[27] Pixel-specific Data includes "the Pixel ID and cookie."[28]

27. FTC Commissioner Rohit Chopra addressed the harms that can be caused by sharing information with Facebook when he stated in 2019, "Because behavioral advertising allows advertisers to use mass surveillance as a means to their undisclosed and potentially nefarious ends, Facebook users

---

[21] Facebook, Create A Customer List Custom Audience,
https://www.facebook.com/business/help/170456843145568?id=2469097953376494.
[22] Facebook, Retargeting, https://www.facebook.com/business/goals/retargeting.
[23] *See* Facebook, Facebook Pixel, Accurate Event Tracking, Advanced,
https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also* Facebook, Best Practices For Meta Pixel Setup, https://www.facebook.com/business/help/218844828315224?id=1205376682832142.
[24] Facebook, Specifications For Facebook Pixel Standard Events,
https://www.facebook.com/business/help/402791146561655?id=1205376682832142.
[25] Facebook, About Standard And Custom Website Events,
https://www.facebook.com/business/help/964258670337005?id=1205376682832142.
[26] Facebook, Facebook Pixel, https://developers.facebook.com/docs/facebook-pixel/.
[27] *Id.*
[28] *Id.*

are exposed to propaganda, manipulation, discrimination, and other harms. . . . Facebook's massive, private, and generally unsupervised network of advertisers has virtually free rein to microtarget its ads based on every aspect of a user's profile and activity. The company's detailed dossiers of private information include things like a user's location and personal connections, but it also includes the history of everything a user has ever done wherever Facebook is embedded in the digital world."[29]

### III.     Watch NRL and The Meta Pixel

28.     On information and belief, Watch NRL hosts and delivers many thousands of pre-recorded videos.

29.     Watch NRL hosts the Meta Tracking Pixel and transmits two distinct events to Facebook,[30]  see Figure #2 below:





30.     The Button Click event— is sufficient to permit an ordinary person to identify a specific individual's video viewing behavior.

31.     The Button Click event transmits the Uniform Resource Locator ("URL") accessed,

---

[29] Dissenting Statement of FTC Commissioner Rohit Chopra, In re Facebook, Inc., Commission File No, 1823109, July 24, 2019
https://www.ftc.gov/system/files/documents/public_statements/1536911/chopra_dissenting_statement on facebook_7-24-19.pdf
[30] This data derives from a tool created and offered by Facebook.

which shows the video the visitor viewed, see Figure #3 below:

32.     The Button Click event registers every time a visitor watches a video, see Figure #3 above.

33.     The button text is sufficient to permit an ordinary person to identify what video an individual has viewed.

34.     A visitor who is logged into Facebook while watching a video on Watch NRL will transmit the c_user cookie to Facebook. The c_user cookie contains that visitor's unencrypted Facebook

ID. When accessing the above video, for example, Watch NRL compels the browser to send multiple

| Name | ▲ | Value |
|---|---|---|
| c_user | | 10000█████████ ← |
| datr | | saFWZXu696kRJfnBDt3cUDkn |
| fr | | 1dxSlBhRlbzaQQgDs.AWWbeQCnDqYYUQYRXRXuZ5ySoic.... |

cookies, which are visible in Figure #4 below:

35.     When a visitor's browser has recently logged out of Facebook, Watch NRL compels the browser to send a smaller set of cookies, see Figure #5 below:

| datr | saFWZXu696kRJfnBDt3cUDkn | .faceboo... |
|---|---|---|
| fr | 1dxSlBhRlbzaQQgDs.AWWbeQCnDqYYUQYRXRXuZ5ySoic.... | .faceboo... |

36.     The fr cookie contains, at least, an encrypted Facebook ID and browser identifier.[31] The datr cookies also identifies a browser.[32] Facebook, at a minimum, uses the fr cookies to identify users.[33]

37.     Without a corresponding Facebook ID, the fr cookie contains, at least, an abbreviated and encrypted value that identifies the browser. Facebook uses the cookie for targeted advertising.

38.     The fr cookie will expire after 90 days unless the visitor's browser logs back into Facebook.[34] If that happens, the time resets, and another 90 days begins to accrue.[35]

39.     Facebook, at a minimum, uses the fr and c_user cookies to link to Facebook IDs and corresponding Facebook profiles.

40.     A Facebook ID is personally identifiable information.  Anyone can identify a Facebook profile-and all personal information publicly listed on that profile—by appending the Facebook ID to the end of Facebook.com.

41.     By compelling a visitor's browser to disclose the c_user cookie alongside event data for

---

[31] Data Protection Commissioner, Facebook Ireland Ltd, Report Of Re-Audit (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf.
[32] Facebook, Cookies & Other Storage Technologies, https://www.facebook.com/policy/cookies/.
[33] Id.
[34] See Facebook, Cookies & Other Storage Technologies, https://www.facebook.com/policy/cookies/.
[35] Confirmable through developer tools.

videos, Watch NRL knowingly discloses information sufficiently permitting an ordinary person to identify a specific individual's video viewing behavior.

**VI.    Experience of Plaintiff Josh Blakeley**

42.    In June 2023, Plaintiff Blakeley purchased a digital subscription to Watch NRL in order to watch pre-recorded videos.

43.    Since in or about 2007, Plaintiff Blakeley has had a Facebook account.

44.    Plaintiff Blakeley frequently visits Watch NRL to, among other things, watch pre-recorded videos.

45.    On information and belief, when Plaintiff Blakeley watches pre-recorded videos on www.watchnrl.com, Watch NRL discloses to Facebook his Facebook ID, browser identifiers, and other identifying information.

46.    On information and belief, when Plaintiff Blakeley watches pre-recorded videos on Watch NRL, Defendant discloses his event data, which includes the pages he views and the buttons he clicks. This event data, which Watch NRL transmits through first-party cookies, is sufficient to identify each video's title.

47.    Plaintiff Blakeley discovered that Watch NRL surreptitiously collected and transmitted his Personally Identifiable Information in or about August 2024.

## TOLLING OF THE STATUTES OF LIMITATIONS

48.    Each unauthorized transmission of Plaintiff's and Class Members' Personally Identifiable Information by Watch NRL is a separate unlawful act that triggers anew the relevant statute of limitations.

49.    Additionally, any applicable statutes of limitation have been tolled by: (1) the fraudulent concealment doctrine based on Defendants' knowing and active concealment and denial of the facts alleged herein including but not limited to their incorporation of the tracking pixels and devices; and (2) the delayed discovery doctrine, as Plaintiff and Class Members did not and could not reasonably have discovered Defendants' conduct alleged herein until shortly before the filing of this Complaint. Plaintiff and Class Members did not discover and could not reasonably have discovered that Defendants were disclosing and releasing their PII in the ways set forth in this Complaint until shortly before this

lawsuit was filed, in consultation with counsel.

50.     The Meta Pixel, and other tracking tools on Watch NRL's website, were and remain entirely invisible to a website visitor.

51.     Through no fault of their own or lack of diligence, Plaintiff and Class Members were deceived and could not reasonably discover Defendants' unlawful conduct. Defendants' Privacy Policy does not inform Defendants' customers that their PII will be disclosed to unauthorized third parties such as Meta as described in this Complaint.

52.     Plaintiff was therefore ignorant of the information essential to pursue his claims, without any fault or lack of diligence on his part.

53.     Defendants have and had exclusive knowledge that Watch NRL's website incorporates the Meta Pixel, and other tracking tools, and the information those pixels and tools are configured to collect and disclose, and yet Defendants failed and continue to fail to disclose to website visitors, including Plaintiff and Class Members, that by interacting with Watch NRL's website their PII would be disclosed to, released to, or intercepted by Meta and other unauthorized third parties.

54.     Under the VPPA, Defendants were and continue to be under a duty to disclose the nature, significance, and consequences of their collection and treatment of website visitors' and customers' PII. However, to date, Defendants have not conceded, acknowledged, or otherwise indicated to Watch NRL's customers and other website visitors that Watch NRL has disclosed or released their PII to unauthorized third parties. Accordingly, Defendants are estopped from relying on any statute of limitations.

55.     Moreover, all applicable statutes of limitation have also been tolled pursuant to the discovery rule.

## CLASS ACTION ALLEGATIONS

56.     Plaintiff brings this action, on behalf of himself and all others similarly situated, as a class action pursuant to Federal Rules of Civil Procedure, Rule 23 ("Rule 23").

///

///

///

57.     Pursuant to Rule 23, Plaintiff seeks to represent the following Class (members of which are collectively referred to herein as "Class Members"):

> All persons in the United States who subscribe or who have subscribed to Watch NRL and, while having a Facebook account, viewed prerecorded video content on www.watchnrl.com during the time the Meta Pixel was active on www.watchnrl.com.

58.     Excluded from the Class are Defendants, their employees, agents and assigns, and any members of the judiciary to whom this case is assigned, their respective court staff, the members of their immediate families, and Plaintiff's counsel.

59.     Plaintiff reserves the right to revise or amend the above Class definition based on the discovery of new information.

60.     This action has been brought and may be properly maintained as a class action under Rule 23 because there is a well-defined community of interest in the litigation, the proposed Class is easily ascertainable, and Plaintiff is a proper representative of the Class.

61.     **Numerosity (Rule 23(a)(1)):** The potential members of the proposed Class, as defined and identified herein, are, on information and belief, more than one thousand, and so numerous that joinder of all members of the Class is impracticable.

62.     **Typicality (Rule 23(a)(3)):** Plaintiff's claims are typical of the claims of the Class. Plaintiff has been a subscriber to Watch NRL since 2022, he used Watch NRL's website to view pre-recorded videos on the same personal computer they used to access Meta and, as a result, their PII was disclosed to Meta.

63.     **Commonality (Rule 23(a)(2)):** Common questions of fact and law exist as to all Class Members and predominate over the questions affecting only individual members of the Class. With respect to the Class Members these common questions include but are not limited to:

> (a)     Whether Defendants, through Watch NRL, are engaged in the business of "rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials" and, thus, is a "video tape service provider" within the meaning of 18 U.S.C. § 2710(a)(4);

(b)      Whether Class Members are "subscriber[s] of goods or services from a video tape service provider" and, thus, are "consumers" within the meaning of 18 U.S.C. § 2710(a)(1);

(c)      Whether Watch NRL had Meta Pixels embedded on its website that disclosed Class Members' PII to Meta and/or any other unauthorized third party;

(d)      Whether Class Members' information collected, disclosed, and shared by Watch NRL with unauthorized third parties, including Meta, constitutes PII within the meaning of the Video Privacy Protection Act, 18 U.S.C. §§ 2710 *et seq.*;

(e)      Whether Watch NRL obtained "informed, written consent" from Class Members within the meaning of 18 U.S.C. § 2710(b)(2)(b) and meets the requirements of that subsection; and

(f)      Whether Watch NRL's acts and practices violated the Video Privacy Protection Act, 18 U.S.C. §§ 2710 *et seq.*

64.      **Adequacy of Representation (Rule 23(a)(4)):** Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff's interests do not conflict with those of Class Members, he has no conflict of interest with other Class Members, is not subject to any unique defenses, and has retained competent and experienced counsel that has experience in complex consumer protection class action and cases, as well as sufficient financial and legal resources to prosecute this case on behalf of the Class. Plaintiff and his counsel have no interest that is in conflict with or otherwise antagonistic to the interests of other Class Members. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the members of the Class. Plaintiff and his counsel anticipate no difficulty in managing the litigation of this as a class action.

65.      **Predominance and Superiority (Rule 23(b)(3)):** In addition to satisfying the prerequisites of Rule 23(a), Plaintiff satisfies the requirements for maintaining a class action under Rule 23(b)(3). Common questions of law and fact predominate over any questions affecting only individual members of the Class, and a class action is superior to individual litigation and all other available methods for the fair and efficient adjudication of this controversy. Here, common issues predominate because liability can be determined on a class-wide basis even if some individualized

damages determination may be required. Individualized litigation also presents a potential for inconsistent or contradictory judgments, and increases the delay and expense presented by complex legal and factual issues of the case to all parties and the court system. Furthermore, the expense and burden of individual litigation make it impossible for Class Members to individually redress the wrongs done to them and individual Class Members do not have a significant interest in controlling the prosecution of separate actions. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court. If this action is not certified as a class action, it will be impossible as a practical matter for many or most Class Members to bring individual actions to recover money from Defendants, due to the relatively small amounts of such individual recoveries relative to the costs and burdens of litigation. Plaintiff anticipates no difficulty in the management of this action which would preclude its maintenance as a class action.

66.     Plaintiff reserves the right to add representatives for the Class, provided Defendants are afforded an opportunity to conduct discovery as to those representatives.

## CAUSE OF ACTION

### *Violation of the Video Privacy Protection Act, 18 U.S.C. § 2710, et seq.*

67.     Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

68.     The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally identifying information" concerning any "consumer" to a third party without the "informed, written consent . . . of the consumer" and the opportunity to opt out of disclosures. *See generally* 18 U.S.C. § 2710.

69.     Watch NRL is "video tape service provider" because it is "engaged in the business, in or affecting interstate commerce, of . . . delivery of prerecorded . . . audiovisual materials." 18 U.S.C. § 2710(a)(4).

70.     Plaintiff and Class Members are "consumers" because they are "subscribers" to Watch NRL's services, each having agreed to pay a weekly, monthly, or annual amount to access Watch NRL's live-streaming events and its library of pre-recorded videos, a service Watch NRL describes as

a "subscription."[36] 18 U.S.C. § 2710(a)(1).

71.     Watch NRL discloses "personally identifiable information" of Plaintiff and other Class Members to Meta, and, on information and belief, other unauthorized third parties, because Watch NRL sends "information which identifies a person as having requested or obtained specific video materials" from Watch NRL, 18 U.S.C. § 2710(a)(3), specifically the title and/or identity of every video watched alongside information that would allow the recipients of the information Watch NRL sends, and an ordinary person, to identify the user.

72.     Watch NRL does not seek, let alone receive, "informed, written consent" from Plaintiff and other Class Members, 18 U.S.C. § 2710(b)(2)(B), and it consequently never provides them the opportunity to withdraw any such consent, 18 U.S.C. § 2710(b)(2)(iii).

73.     Watch NRL provides Plaintiff's and Class Members' PII to Meta, and, on information and belief, other unauthorized third parties, knowingly. In particular, Watch NRL installed, embedded, and/or otherwise permitted the presence of the Meta Pixel, on its website and knew that this pixel and tracking tool would gather and disclose the titles and/or identities of prerecorded videos watched by Plaintiff and Class Members.

74.     By knowingly disclosing Plaintiff's and other Class Members' personal viewing content, Watch NRL violates Plaintiff's and other Class Members' statutorily protected rights to privacy in their video-viewing habits and activities. *See* 18 U.S.C. § 2710(c).

75.     As a result of the above-described violations, Watch NRL is liable to Plaintiff and other Class Members for actual damages in an amount to be determined at trial or, alternatively, for "liquidated damages not less than $2,500 per plaintiff." 18 U.S.C. § 2710(c)(2)(A). Under the Act, Watch NRL is also liable for reasonable attorneys' fees, other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury and sufficient to prevent and deter the same or similar conduct by Watch NRL in the future.

76.     Plaintiff, on behalf of himself and the Class, seeks relief as further described below.

---

[36] *See* https://www.watchnrl.com (Last visited August 5, 2024)

**PRAYER FOR RELIEF**

Plaintiff on behalf of himself and other Class Members prays for judgment against Defendants as follows:

77.     An order certifying the Class as requested herein;

78.     An order appointing Plaintiff Josh Blakeley as Class Representative;

79.     An order appointing the undersigned attorneys as Class Counsel;

80.     An order awarding Plaintiff and Class Members statutory damages of no less than $2,500 per Class Member per violation of the Video Privacy Protection Act, 18 U.S.C. § 2710, et seq.;

81.     An injunction forbidding Defendants from disclosing information about users' video viewing choices to third parties pursuant to 18 U.S.C. § 2710(c)(2)(D);

82.     An award of reasonable attorneys' fees and costs of suit, including costs of investigation;

83.     An award of pre- and post-judgment interest as provided by law; and

84.     An award of such other and further relief, at law and in equity, as the nature of this case may require or as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff, on behalf of himself and all other members of the Class, hereby demands a jury trial on all issues so triable.

Respectfully submitted,

Dated: August 9, 2024          ___/s/ Julian Hammond_____
                              JULIAN HAMMOND (SBN 268489)
                              jhammond@hammondlawpc.com
                              ADRIAN BARNES (SBN 253131)
                              abarnes@hammondlawpc.com
                              ARI CHERNIAK (SBN 290071)
                              acherniak@hammondlawpc.com
                              POLINA BRANDLER (SBN 269086)
                              pblandler@hammondlawpc.com
                              HAMMONDLAW, P.C.
                              1201 Pacific Ave, 6th Floor
                              Tacoma, WA 98402
                              (310) 807-1666

                              *Attorneys for Plaintiff and the Putative Class*